02-12-121-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00121-CV

 

 


 
 
 In
 the Interest of J.P., M.A., and M.V., Children
  
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 323rd District
 Court
  
 of
 Tarrant County (323-94161J-11)
  
 November
 29, 2012
  
 Opinion
 by Justice Gabriel
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Justice Lee Gabriel

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-12-00121-CV


 
 
 In the Interest of J.P., M.A., and M.V., Children
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

Appellant
H.P. (Mother) appeals the termination of her parental rights to her children,
J.P. (Jeffery), M.A. (Monica), and M.V. (Mark).[2] 
Appellant A.V. (Father) appeals the termination of his parental rights to his
child, Mark.  We affirm.

Background
Facts

The
Department of Family and Protective Services (DFPS or the Department) first
became involved with Mother in 2009 when it received a referral for neglectful
supervision.  Mother’s oldest son, Jeffery, had fallen off of a second-floor
balcony.[3]  Jeffery was three years
old at the time.  Mother explained that she had been folding clothes in the
bedroom and had left Jeffery and Monica in the other room for approximately
twenty minutes.  Jeffery opened the sliding glass door to the balcony, stood on
top of a trash can and fell over the railing.  Mother said that Jeffery had
opened the glass door before and had unlocked the front door in the past too.  Jeffery
did not suffer any physical problems after his fall.  DFPS placed the children
with a friend of Mother’s family.  Mother completed her services, and the
children were returned to her care.

In March
2010, Mother gave birth to her youngest child, Mark.  Mother and Father were
raising all three children together.  The children consider Father their
father.

In
March 2011, Mother and Father brought Mark to Cook Children’s Medical Center
with swelling to his head.  An examination by Dr. Sophia Grant, a pediatrician
at Cook Children’s, revealed a skull fracture and a possible fracture of his
tibia.  Mark was not yet a year old at that time and could not walk on his
own.  Dr. Grant testified that Mark’s head injury could not have occurred from
him hitting his head on a wall, which had been one of the explanations Mother
had offered.  Dr. Grant also testified that Mark’s leg injury was not the kind
of injury that occurs accidentally.

DFPS
took custody of Mark.  Father refused to tell DFPS how to find Monica and Jeffery. 
Mother was also uncooperative.  DFPS was eventually able to find Monica and
Jeffery, and all three children were put in foster care.

After
a bench trial, the trial court found that Mother had knowingly placed or had
knowingly allowed the children to remain in conditions or surroundings that
endangered their physical or emotional well-being, that she had engaged in
conduct or had knowingly placed the children with persons who had engaged in
conduct that endangered their physical or emotional well-being, and that
termination of her parental rights was in the children’s best interest.  The
trial court also found that Father had knowingly placed or had knowingly
allowed Mark to remain in conditions or surroundings that endangered his
physical or emotional well-being, that he had engaged in conduct or had knowingly
placed Mark with persons who had engaged in conduct that endangered his
physical or emotional well-being, and that termination of his parental rights
was in Mark’s best interest.  Mother and Father then filed this appeal.

Standard
of Review

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the
State seeks not just to limit parental rights but to erase them permanently—to
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  Tex.
Fam. Code Ann. § 161.206(b) (West 2008); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and
strictly construe involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort
Worth 2009, no pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2012); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625,
629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also § 161.206(a). 
Evidence is clear and convincing if it “will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.”  Id. § 101.007 (West 2008).  Due process
demands this heightened standard because termination results in permanent,
irrevocable changes for the parent and child.  In re J.F.C., 96 S.W.3d
256, 263 (Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex.
2007) (contrasting standards for termination and modification).

Discussion

I.  Endangerment

In
Mother’s first two issues, she challenges the legal and factual sufficiency of
the evidence supporting the trial court’s findings that she endangered the
children. In Father’s first two issues, he challenges the legal and factual
sufficiency of the evidence supporting the trial court’s findings that he
endangered Mark.

In
reviewing the evidence for legal sufficiency in parental termination cases, we
must determine whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that the grounds for termination were proven. 
In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the
evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the factfinder resolved any disputed facts
in favor of its finding if a reasonable factfinder could have done so.  Id. 
We must also disregard all evidence that a reasonable factfinder could have
disbelieved.  Id.  We must consider, however, undisputed evidence even
if it is contrary to the finding.  Id.  That is, we must consider
evidence favorable to termination if a reasonable factfinder could, and
disregard contrary evidence unless a reasonable factfinder could not.  Id.

We
must therefore consider all of the evidence, not just that which favors the
verdict.  Id.  But we cannot weigh witness-credibility issues that
depend on the appearance and demeanor of the witnesses, for that is the
factfinder’s province.  Id. at 573, 574.  And even when credibility
issues appear in the appellate record, we must defer to the factfinder’s determinations
as long as they are not unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we must give due deference to
the factfinder’s findings and not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the parents violated subsection (D) or (E) of section
161.001(1).  Tex. Fam. Code Ann. § 161.001; C.H., 89 S.W.3d at 28.  If,
in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant
that a factfinder could not reasonably have formed a firm belief or conviction
in the truth of its finding, then the evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108.

“Endanger”
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth
2003, no pet.).  Under subsection (D), it is necessary to examine evidence
related to the environment of the children to determine if the environment was
the source of endangerment to the children’s physical or emotional well-being. 
J.T.G., 121 S.W.3d at 125.  Conduct of a parent in the home can create
an environment that endangers the physical and emotional well-being of a child.
 In re W.S., 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).  For
example, abusive or violent conduct by a parent or other resident of a child’s
home may produce an environment that endangers the physical or emotional
well-being of a child.  See id. at 776–77; Ziegler v. Tarrant Cnty.
Child Welfare Unit, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ
ref’d n.r.e.).

Under
(E), the relevant inquiry is whether evidence exists that the endangerment of
the children’s physical well-being was the direct result of the parents’
conduct, including acts, omissions, or failures to act.  See J.T.G., 121
S.W.3d at 125; see also Tex. Fam. Code Ann. § 161.001(1)(E).  Additionally,
termination under (E) must be based on more than a single act or omission; the
statute requires a voluntary, deliberate, and conscious course of conduct by
the parent.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann.
§ 161.001(1)(E).  It is not necessary, however, that the parents’ conduct
be directed at the children or that the children actually suffer injury.  Boyd,
727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125.  The specific danger to
the children’s well-being may be inferred from parental misconduct standing
alone.  Boyd, 727 S.W.2d at 533; In re R.W., 129 S.W.3d
732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  To determine whether
termination is necessary, courts may look to parental conduct occurring both
before and after the children’s birth.  In re D.M., 58 S.W.3d
801, 812 (Tex. App.—Fort Worth 2001, no pet.).

A.  The
evidence

Kriste
Moron, a DFPS investigator, was assigned to Mother’s 2009 case regarding
Jeffery’s fall.  She testified that the sliding door that Jeffery opened has a
bar with a child lock on it.  When she showed it to Mother, Mother told her
that she did not know what it was.  Mother told Moron that Jeffery had gotten
out on the balcony on other previous occasions.  When asked about what
precautions she had taken to keep Jeffery from opening the balcony door and
front doors, Mother showed Moron a child safety latch that she used on the
front door.  Mother did not use the child safety latch on the balcony door, but
she did keep it locked.

Mother
testified that Jeffery fell from the balcony because he was playing Spiderman
while she was in the bedroom.  She said that Jeffery only ever got out
of the front door once.  Mother also offered testimony that conflicted with her
previous statement when she testified that the day Jeffery fell was the only
time he had ever gotten onto the patio without her knowing.  Mother said that
she knew that Jeffery knew how to unlock the sliding glass door, but he had
always unlocked it in her presence.  Mother testified that she was vigilant in
watching Jeffery.  When asked if she thought she could have prevented Jeffery’s
fall, she said, “I truly don’t know.”  Mother said she found out that Jeffery
had fallen when the emergency medical technicians knocked on her door.

Regarding
Mark’s head injury, Mother said she was on the couch with Monica and him when
the clothes dryer finished its cycle.  She left the children on the couch to
get the clothes, and when she walked back in the room, Mark was lying on the
floor, crying.  Mother said she picked him up and checked him for injuries but
she did not see any.  Mark stopped crying after Mother picked him up.

Later
that evening, Mother noticed swelling on Mark’s head.  She applied a warm
compress with salt water to reduce the swelling.  Mother noticed that Mark was
fussy and restless.  Mother testified that she waited about four days before
taking Mark to the hospital.  She admitted that waiting that long was not the
behavior of a vigilant parent, but said that she waited because Mark was not
crying.  Mother testified that she told a DFPS worker or a police officer that
Mark might have hit his head on a wall in her bedroom, but at trial, she said
that she did not believe his injury was from hitting a wall.

Dr.
Grant said that the leg injury was not a birth injury but that it occurred a
few days before the beginning of March 2011.  She testified that leg injuries such
as Mark’s

happen if, say, for instance, a child is being shaken and
the limbs are flailing and flapping back and forth, or say, for instance, in a
diaper change, someone gets frustrated and the leg is jerked suddenly so that
the insertion of the muscle on the outside edges of the bone actually pulls off
a corner part of the bone.

Dr.
Grant testified that this type of injury is “an abusive injury.”  She also said
that after the injury occurred, the parent or caretaker might not necessarily
know that the injury had occurred.  However, she said that “any reasonable
person would recognize that the level of force used to cause this type of
fracture is inappropriate.  It’s not just normal diapering . . .;
it’s a forceful jerk that is inappropriate for this situation.”

Mother
testified that she had no idea that Mark’s leg was injured until the hospital
told her.  She said that Mark was crawling and able to pull himself up and had
never appeared to be in pain.  Dr. Grant said the head injury could
have occurred accidentally.  It could happen when a child falls off of a bed on
to a wood floor, or if someone were to accidentally drop the child while carrying
him.

Dr.
Grant said that it was “highly unlikely” that the skull fracture resulted from
hitting the corner of a coffee table because typically those injuries involve a
depression in the skull from where the head hit the table.  She testified that
Mark’s injuries were the result of a lack of supervision, which concerned her. 
The injuries appeared to have occurred within days of each other.  Moron testified
that Mark’s injuries could only have been inflicted by the parents, but she did
not know which one injured him.

Moron
said that no one reported any other caretakers for the children.  At trial, Mother
testified that another man had been living with Mother and Father for about three
to six months.  Mother said that the man did not care for Mark and had only
held him once, while Mother watched him.  Mother testified there was never a
time that the man was alone with Mark.  She said that she and Father were the
only people who ever cared for Mark.

Monica
and Jeffery told a DFPS caseworker, through miming the incidents because of the
language barrier, that they had been physically abused at home.  Monica said
she was dragged by her hair and Jeffery said that he had been hit over the head
with a broom.  Jeffery had two gash marks on his head that he claimed came from
a broom being broken over his head.

Kerrill
Mendez, a DFPS conservatorship worker, testified that the fact that Jeffery
fell out of a balcony and, two years later, Mark had unexplained injuries to
his skull and tibia was concerning because “it seems like there is a
continuance in neglect.”  Mendez testified that the parents were given services
before, but she did not think that the parents learned in their previous
services because new injuries to the children occurred.

B.  The
evidence is legally and factually sufficient

After
one of her children opened the balcony door and fell two stories because Mother
had left him unsupervised, Mother continued to leave her children unsupervised. 
Mother was not even aware that Jeffery had escaped and fallen from the balcony
until the emergency medical technicians knocked on her door.  Two years and one
additional child later, Mother proved no more capable of safeguarding her
children or knowing that one of them was in need of aid.

After
noticing swelling on Mark’s head, Mother waited three or four days to seek
medical care.  Mother claimed that she did not know Mark’s leg was injured but
at the time he was placed in foster care, Mark had severe problems with his
legs and could barely walk.  The hospital also noted that Mark was underweight
and diagnosed him with failure to thrive.

Despite
the parents’ insistence that they were the only caretakers, neither parent was able
to provide any likely explanation for Mark’s injuries.  Dr. Grant testified
that Mark’s tibia fracture was an “abusive” injury that could not have occurred
accidentally.  See In re C.W., No. 13-08-00112-CV, 2009 WL 140524, at *5
(Tex. App.—Corpus Christi Jan. 22, 2009, no pet.) (upholding trial court’s
endangerment findings when mother failed to explain child’s injuries and
doctor’s report noted that they were the result of “non-accidental trauma”); In
re J.W., No. 02-08-00145-CV, 2008 WL 5056788, at *5 (Tex. App.—Fort Worth
Nov. 26, 2008, pet. denied) (upholding trial court’s endangerment findings when,
among other things, mother continued to allow father to care for children
despite father being rough with the children but claiming that he did not know
how children got injured).  The children told violent stories to DFPS about
having their hair pulled and being beaten with brooms.  Jeffery had gashes
where he said someone had broken a broom over his head.  Jeffery also had problems
in school, was “very violent” and “really angry,” and kicked and punched other
children.

Looking
at all the evidence in the light most favorable to the trial court’s findings,
giving due consideration to evidence that the fact finder could reasonably have
found to be clear and convincing, we hold that a reasonable trier of fact could
have formed a firm belief or conviction that Mother knowingly placed or
knowingly allowed the children to remain in conditions or surroundings that endangered
their physical or emotional well-being, and that she engaged in conduct or
knowingly placed the children with persons who engaged in conduct that endangered
the children’s physical or emotional well-being.  A reasonable trier of fact
could also have formed a firm belief or conviction that Father knowingly placed
or knowingly allowed his child to remain in conditions or surroundings that endangered
his physical or emotional well-being, and that he engaged in conduct or
knowingly placed Mark with persons who engaged in conduct that endangered the
child’s physical or emotional well-being.  We overrule Mother’s first two
issues and Father’s first two issues.

II.  Best
Interest

In
Mother’s third issue, she challenges the legal and factual sufficiency of the
evidence supporting the trial court’s finding that termination of her parental
rights was in the children’s best interest.  In Father’s third issue, he
challenges the legal and factual sufficiency of the evidence supporting the
trial court’s finding that termination of his parental rights was in Mark’s best
interest.

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1) the child’s age
and physical and mental vulnerabilities;

 

(2) the frequency and
nature of out-of-home placements;

 

(3) the magnitude, frequency,
and circumstances of the harm to the child;

 

(4) whether the child
has been the victim of repeated harm after the initial report and intervention
by the department or other agency;

 

(5) whether the child
is fearful of living in or returning to the child’s home;

 

(6) the results of
psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child’s
home;

 

(7) whether there is
a history of abusive or assaultive conduct by the child’s family or others who
have access to the child’s home;

 

(8) whether there is
a history of substance abuse by the child’s family or others who have access to
the child’s home;

 

(9) whether the
perpetrator of the harm to the child is identified;

 

(10) the willingness
and ability of the child’s family to seek out, accept, and complete counseling
services and to cooperate with and facilitate an appropriate agency’s close
supervision;

 

(11) the willingness
and ability of the child’s family to effect positive environmental and personal
changes within a reasonable period of time;

 

(12) whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with:

 

(A) minimally adequate
health and nutritional care;

 

(B) care, nurturance,
and appropriate discipline consistent with the child’s physical and
psychological development;

 

(C) guidance and
supervision consistent with the child’s safety;

 

(D) a safe physical
home environment;

 

(E) protection from
repeated exposure to violence even though the violence may not be directed at
the child;  and

 

(F) an understanding
of the child’s needs and capabilities;  and

 

(13) whether an adequate social support system consisting
of an extended family and friends is available to the child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires
of the child;

 

(B)     the emotional
and physical needs of the child now and in the future;

 

(C)     the emotional
and physical danger to the child now and in the future;

 

(D)     the parental
abilities of the individuals seeking custody; 

 

(E)     the programs
available to assist these individuals to promote the best interest of the
child;

 

(F)     the plans for
the child by these individuals or by the agency seeking custody;

 

(G)     the stability
of the home or proposed placement;

 

(H)     the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and

 

(I)      any excuse for the acts or omissions of the
parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

A.  The
evidence

At
the time of trial, Jeffery was almost seven years old, Monica was four years old,
and Mark was about to turn two years old.  See Tex. Fam. Code Ann. § 263.307(b)(1). 
This
case is the second time that DFPS has been involved with Mother.  See id.
§ 263.307(b)(2),
(4).  In 2009, Jeffery and Monica were removed after Jeffery fell from the
balcony.  Jeffery did not suffer physical injuries from his fall, but Mark had
two unexplained injuries—one to his head and one to his leg—when Mother and
Father took him to the hospital in March 2011.  See
id.
§ 263.307(b)(3). 
Mark
had trouble walking when he first went into care and was underweight.  He
received treatment and had improved over time.  See id. § 263.307(b)(12)(A).

Mendez
testified that the children have indicated that they do not want to return home
to Mother and Father.  See id. § 263.307(b)(5).  Mendez
said that the children demonstrated “what happened when they were at home.”  They
showed that Monica would be dragged by her hair, and Jeffery said that he had
been hit over the head with a broom.  Jeffery had two gash marks on his head
that he claimed came from a broom being broken over his head.  Mother denied
ever pulling the children’s hair or hitting them with a broom.  Mother denied
that Father had ever pulled their hair and when asked if he had ever hit them
with a broom, she said, “No, I don’t know.”

Mother
testified that Father had a quick temper.  See id. § 263.307(b)(7). 
She said, “He gets angry. But he doesn’t get angry to the point where he hits
somebody. When he gets angry, what he does is he leaves.”  She said that the last
time she saw him get so angry that he had to leave was about two years before trial. 
Mother testified that Father had never hit her.

Father
said,

[T]hat thing that the lady is saying that he was hit with
a broom, that’s a lie, but I do punish him, and when he doesn’t understand or I
do have him go sit in the corner[.]  I don't think any of us here, all of us
here in the courtroom, I can’t imagine any of us not having reprimanded or
punished our children, but that’s, what they’re saying when you come and you
hit them like that, no.

Father
said that he had spanked Jeffery but never so roughly as Jeffery claimed.  He
said, “I love my children. I’m not capable of hitting them or mistreating them.” 
Father testified that he pulled the children’s hair “[w]hen [they] were
playing.”

When
DFPS took Mark into custody, Father refused to provide information on Monica
and Jeffery’s whereabouts.  Neither Father nor Mother ever provided an
explanation for Mark’s injuries.  See id. § 263.307(b)(9). 
Mendez explained that one of the goals in the parents’ service plans was to
demonstrate their ability to protect the children from future abuse or neglect
but that neither parent had met that goal.  Neither of the parents could
identify another caretaker or other person who had the opportunity to harm
Mark.  At trial, Father still did not provide an answer regarding the
perpetrator of Mark’s injuries.  He said, “I can send him to a day care or they
can send [DFPS] to my house to keep supervising the house, and I’ll pay for all
that.  I’ll pay for whatever has to be needed.”  He said that he and Mother had
taken Mark to the hospital in February 2011 for bronchitis and that hospital
employees did a number of tests on Mark.  Father said he saw them pulling
Mark’s legs.

The parents
did not successfully complete their service plans by the time of trial.  See
id. § 263.307(b)(10).  Mother completed individual counseling.  Mother
also completed a two-hour parenting class.  Six months in to her services, she
was asked to complete additional parenting classes.  DFPS did not receive a
certificate of completion by the time of trial.

Father
attended two or three sessions of individual counseling at the beginning of the
case.  In January 2012, he asked if he could start attending counseling again. 
Since then, he only attended another one or two sessions by the time of trial. 
Father was also asked to complete a positive discipline course, but he did not
turn in a certificate of completion to DFPS for the course.  During trial,
Mother presented certificates of completion of the positive discipline course
for both parents.

Both
parents regularly attended visitation.  Father missed approximately one
visitation a month because of his work schedule.  Mendez testified that Father
was bonded to the children.  See id. § 263.307(b)(12)(B).  Mendez
did express concern that Jeffery was not interacting with the family at the
beginning of the case, but by the time of trial, he was interacting well with
the whole family.

Mother
testified that Jeffery had been doing fine in school while in her care.  She
believed that he was performing at an advanced level for his age.  Mother
testified that she disciplined her children by reprimanding them and taking
away their toys.  She said she has never spanked them, but she did not know if
Father had ever spanked them.  Mendez testified that when Jeffery came
into care, he was “very violent,” and would act out and punch and kick other
children.  See id. § 263.307(b)(12)(F).  Jeffery was very angry and
was suspended soon after starting school.  Mendez said this was not typical
behavior for a four-year-old.  She testified that Jeffery was doing much better
by the time of trial.  He was no longer getting suspended from school, although
he still had some “issues with boundaries.”  Mendez believed that Jeffery’s
relationship with his siblings was “way better” than it had been.  She said, “He’s
a lot more loving.  He used to push and, you know, was really kind of
aggressive with his siblings, but just recently, I think it was last Friday, I
observed him just playing with his siblings and loving on them and actually
asking, are you okay?”

Mother
worked as a house cleaner and Father worked as a roofer.  Mother testified that
she and Father pay equal shares of the bills, and they do not struggle to pay
them.  Mother had worked for her employer for about three months by the time of
trial.  Before her current job, Mother had not been working; she testified that
this was the only job she had held in the year before trial.  Father earned around
$1,000 to $1,200 a week.  Mother testified that sometimes Father was paid in
cash and sometimes he received a check.  Mother did not provide DFPS with any
income verification documents.  She testified that she made about $400 a week. 
Mother has a daughter who lives in Honduras with Mother’s ex-mother-in-law. 
Mother sends $200 every other week to support her daughter.

Mother
drove Father’s truck, but she did not have a U.S. driver’s license.  Father
said he had a driver’s license from Mexico.  Father said that if the children
had been returned to him at trial, they could have gone home with him “and do
well and in the future have a career.”  He said he could pay his sister-in-law
to take care of them while he and Mother were at work.  Father said the children
had been registered at school and he would make sure they were registered again
if they were returned.

Mendez
testified that the Department believed that adoption was the best plan for the
children because it provided permanency.  The children were placed in a
dual-licensed foster home, but the foster home indicated that they were not
interested in adopting the children.  Mother testified that she did not know if
her children were being abused or neglected in their foster care but at her
last visitation, Mother said Jeffery’s thumb was injured.  In January 2012, a
family friend, S.J.P., offered to adopt the children if the parents’ rights
were terminated.  DFPS conducted a home evaluation, but was concerned that
S.J.P. was not making enough money to support herself and the children.  All of
the other placements suggested by the parents were denied for various reasons,
including that all of the suggested placements were living illegally in the
United States, which would prevent them from adopting the children through
DFPS.

DFPS
had begun home studies for potential adoptive placements for the children. 
Mendez testified that, at the time of trial, DFPS had about ten to fifteen
potential placements that the Department believed were good candidates for the
children.  Mendez testified that if the parents’ rights were terminated,
DFPS planned to immediately move the children in to one of the preapproved
adoption-motivated homes.  She believed that it would be relatively easy to
find an adoptive home for the children.

B.  The
evidence is sufficient

Mother
continued to leave her children unsupervised, despite a documented previous
instance of danger to the children and services to prevent a reoccurrence of
neglectful or abusive parenting.  The children reported multiple incidences of physical
violence in their home and they did not want to return to Mother and Father.  The
parents did not complete their service plans, including demonstrating
their ability to protect the children from future abuse or neglect or identifying
the cause of Mark’s injuries.  Considering the relevant statutory and Holley
factors, we hold that, in light of the entire record, and giving due
consideration to evidence that the jury could have reasonably found to be clear
and convincing, the trial court could reasonably have formed a firm belief or
conviction that termination of Father’s parental rights to Mark and Mother’s parental
rights to Jeffery, Monica, and Mark was in the children's best interests.  See
In re A.T.K., No. 02-11-00520-CV, 2012 WL 4450361, at *15 (Tex. App.—Fort
Worth Sept. 27, 2012, no pet. h.) (mem. op.) (upholding trial court’s best
interest finding when, among other things, mother could not provide an
explanation for her two-month-old’s broken bones); In re T.T.F., 331
S.W.3d 461, 486–87 (Tex. App.—Fort Worth 2010, no pet h.) (upholding trial
court’s best interest finding when, among other things, the child was diagnosed
with failure to thrive and overcame that while in foster care).  Accordingly,
the evidence is legally and factually sufficient to support the trial court’s
family code section 161.001(2) best interest findings.  We overrule Mother’s
third issue and Father’s third issue.

Conclusion

Having
overruled Mother’s and Father’s issues, we affirm the trial court’s judgment.

 

 

LEE GABRIEL
JUSTICE

 

PANEL: 
DAUPHINOT,
GARDNER, and GABRIEL, JJ.

 

DELIVERED:  November 29,
2012








 









[1]See Tex. R. App. P. 47.4.





[2]We use aliases for the
children and their parents throughout this opinion.  See Tex. R. App. P.
9.8(b)(2).





[3]After a diligent search,
Jeffery’s alleged father, M.A.C., and Monica’s alleged father, S.A., could not
be located before trial.  The trial court terminated M.A.C.’s and S.A.’s
parental rights, and they are not parties to this appeal.